# The United States Court of Federal Claims

No. 13-41C
(Filed:  April 16, 2013)*
**\*Opinion originally filed under seal on April 5, 2013**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
|  |  |
|---|---|
| NORSAT INTERNATIONAL [AMERICA], INC., | \* |
| Plaintiff, | \* |
| v. | \* |
| THE UNITED STATES, | \*  Bid Protest; Technical Evaluation; Deference; Agency Evaluation; Lack of Significant Prejudice |
| Defendant, | \* |
| and | \* |
| ENCOMPASS DIGITAL MEDIA, INC., | \* |
| Defendant-Intervenor. | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Janine S. Benton*, Falls Church, VA, for plaintiff. *Kathy C. Potter*, *John M. Murdock* and *Rosanne E. Stafiej*, Falls Church, VA, of counsel.

*William J. Grimaldi*, U.S. Department of Justice, Washington, DC, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, and *Jeanne E. Davidson*, Director, for defendant.

*John E. McCarthy, Jr.*, Washington, DC, for defendant-intervenor.  *David C. Hammond* and *Grant J. Book*, Washington, DC of counsel.

**O P I N I O N**

**FIRESTONE**, *Judge.*

In this bid protest case, Norsat International [America] Inc., ("Norsat" or "the plaintiff") challenges the United States Department of the Army's ("the Army," "the defendant," or "the government") decision to award a contract for the continued development and maintenance of the Defense Video and Imagery Distribution System ("DVIDS") to Encompass Digital Media, Inc. ("Encompass" or "the defendant-intervenor"). Norsat argues that the Army arbitrarily and capriciously concluded that Encompass's proposal, which was rated as "Good—Low Risk," was a better value to the government than Norsat's proposal, which cost nearly * * * more (roughly 36%) and was rated "Outstanding—Very Low Risk." The plaintiff, which was the incumbent contractor, seeks declaratory relief and an injunction ordering the suspension of performance and termination of Encompass's contract. Encompass also seeks attorney's fees and costs.[1]

Presently before the court are the parties' cross-motions for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), the government's partial motion to dismiss under Rule 12(b)(1), and the government's motion to strike portions of the materials included in the appendix to the complaint. As discussed below, because Norsat has failed to show that the Army's conduct was arbitrary, capricious, an abuse of discretion, or contrary to law, the court

---

[1] The government informed the court that Encompass had begun performing under the new contract during the initial joint status conference.

**DENIES** the plaintiff's motion for judgment on the administrative record and **GRANTS** the United States' and the defendant-intervenor's cross-motions for judgment on the record.  The government's other motions are also addressed below.

## I.     STATEMENT OF FACTS

### A.     The DVIDS Program

The DVIDS program facilitates the transmission of public affairs audio, video (including live interviews), still imagery, and print products throughout the Department of Defense ("DoD").  AR 443.  The legacy DVIDS system consists of a network of portable Ku-band satellite transmitters located throughout the world and a distribution hub in Atlanta, Georgia.  AR 59-60.  In total, the network includes more than 200 systems concentrated in Afghanistan, the United States, Germany, Kuwait, Bahrain, Qatar, Japan, the Horn of Africa, and Cuba.  AR 443.

The plaintiff began developing satellite communications equipment for the DVIDS program in 2003 as part of the predecessor contract.  AR 59-60.  Norsat helped conceive, design, field, and support all DVIDS transmitters, AR 524, and between 2004 and 2012 the program deployed over 200 terminals.  AR 59, 524.  During this period Encompass, the defendant-intervenor, provided direct support to the DVIDS program including managing the Atlanta Hub and staffing a 24/7/365 helpdesk for DVIDS users. AR 916.  The record does not indicate that Encompass had any responsibility for the design or development of the legacy DVIDS terminals.

**B.      The Solicitation and Performance Work Statement**

The Army issued a solicitation on March 5, 2012 to continue the support and

development of DVIDS systems.  AR 1-2.  The solicitation's Performance Work

Statement ("PWS") contained detailed descriptions of the five primary tasks to be

performed under the contract, including (1) maintaining and repairing legacy DVIDS

systems; (2) providing a 24/7/365 helpdesk; (3) the option to develop and field new

DVIDS systems; (4) maintaining and repairing new DVIDS systems; and (5) the option

to provide training.[2]  AR 445, 448-49, 453, 456.

With regard to legacy systems, the PWS stated that the contractor "shall be

capable of providing support to all legacy systems within 15 days of contract award[,] to

include maintenance and processing of all spare part order requests."  AR 445.  In this

connection, offerors were given the option of either acquiring the legacy software and

equipment or implementing "new software that w[ould] be capable of operating legacy

systems . . . ."  AR 448.  The PWS required that contractors "have operational knowledge

of all satellite technologies necessary for fielded legacy DVIDS systems . . . .", and also

provided detailed requirements as to response times for maintenance requests.  AR 448.

With regard to helpdesk support, the PWS provided, in part:

> The contractor shall ensure [that] access to a helpdesk technician is possible
> on a 24 hours a day, seven (7) days a week, 365 days a year basis by
> DVIDS [Satellite Communication ("SATCOM")] terminal operators world-
> wide. . . . Technicians manning the helpdesk shall have sufficient
> education, knowledge and experience on the operation and [maintenance]

---

[2] The instant litigation primarily relates to the offerors' responses to the first three general
performance requirements (i.e., legacy systems, helpdesk, and new DVIDS systems).

of mobile satellite communications systems. . . .  A technician shall be accessible who is knowledgeable of the system configuration for which assistance is needed.

AR 448.  In particular, offerors were required to detail (1) how their personnel would travel to support terminals located both within the continental United States ("CONUS") and outside the Continental United States ("OCONUS"); (2) how they would respond to customer service requests on a 24/7/365 basis; (3) a proposed organizational structure; (4) how they would allocate work among team members; (5) how they would obtain, hire and/or retain necessary personnel; (6) how they would communicate with the government; (7) how they would manage quality control; and (8) how they would access and maintain the data repository of fielded DVIDS systems.  See AR 45.

As to the third requirement, the development of new DVIDS systems, the PWS stated that the contractor would develop new ground satellite terminals capable of operating within a 6.5 MHZ Ku satellite bandwidth.  AR 449.  Specifically, this requirement described five system capability types, including (1) Deployable; (2) Transportable; (3) Manpackable; (4) Vehicle Mounted; and (5) Maritime.  AR 450-51. Contractors were not limited to proposing "transmitters or transmitter types that [were] like the legacy systems."  AR 449.  Further, the PWS stated that, "[the contractor] is not confined to the technical means by which the legacy systems operate as long as the capabilities below are met."  AR 449.  The PWS then enumerated 11 capabilities, such as the ability to conduct a live High Definition and Standard Definition interview, the ability to mount the transmitter on a vehicle and a maritime vessel at sea, and the ability to operate in an X-Band environment.  AR 449-50.  In addition, the PWS's tenth

requirement stated that, "[d]epending on [the] military unit using the transmitter or transmitter type, size, weight and portability will be a factor."  AR 450.

The solicitation also included, at the end of the PWS, a 53-page section entitled "Technical Exhibit 1 – Legacy Systems," ("Technical Exhibit").  AR 464-516.  This section, which had "For Informational Purposes Only" written in bold print on the top of the first page, described aspects of the mobile SATCOM terminals that were either currently in use or that were expected to be fielded in the near term.[3]  AR 464.  The introduction to the Technical Exhibit stated, in part:

> SATCOM systems acquired over the performance period of this contract must conform as closely as possible to the operational parameters of the current systems. . . . System descriptions define not only equipment parameters and complement of tools, equipment and manuals, but includes language that might be seen in a Performance Work Statement (PWS) accompanying a solicitation for proposal (e.g. "the contractor shall provide…") . . . . PLEASE NOTE: For the purposes of [this] solicitation . . ., there is no restriction to use any legacy system component associated with this requirement.  Any reference to legacy system equipment or name brand components is strictly as an example (e.g. Ku-Band PPL 1000HA (Norsat) LNA, Panasonic CF-18 laptop).  Unless specifically stated within this document, suitable substitute components or equipment which offers equal or greater operating parameters, range, efficiency and/or which meets or exceeds those factors at a cost savings, may be used in instances where name brand components are given as an example.

AR 464.[4]  The Technical Exhibit then listed performance specifications associated with each of the five legacy transmitter types, which were labeled A-E.  AR 465 (Type-A,

---

[3] In addition to the first page of the Technical Exhibit, the PWS twice stated that the Technical Exhibit was for "informational purposes only."  See AR 443, 450.

[4] In April 2012 the government responded to questions from the offerors, several of which pertained to the purpose and effect of the Technical Exhibit.  See AR 256-63, 356-63.  For example, in response to a question about whether it was "the government's intent that the contractor's proposal provides answers and pricing for all 'shall' statements in Technical Exhibit

Deployable; Type-B, Transportable; Type-C, Manpackable; Type-D, Vehicle Mounted; Type-E, Maritime).  For example, the Technical Exhibit stated that the mean amount of time allowable to repair the transmitter (i.e., the "mean time to repair" ("MTTR")) could be no more than 30 minutes for each transmitter type.  See AR 467 (Type-A MTTR), 477 (Type-B MTTR), 486 (Type-C MTTR), 496 (Type-D MTTR), 507 (Type-E MTTR). Similarly, the Technical Exhibit referred to weight "maximums" for each transmitter type.  See AR 473 (280-pound maximum for Type-A), 482 (1,850-pound maximum for Type-B), 492 (220-pound maximum for Type-C), 503 (350-pound maximum for Type-D), 514 (500-pound maximum for Type-E).

## C.     Special Contract Requirements

Section H of the solicitation enumerated 11 additional special contract requirements.  One of these special requirements, H-8, supplemented the existing requirement under Federal Acquisition Regulation ("FAR") Clause 52.228-3, which requires contractors to provide and maintain workers' compensation insurance as called for by the Defense Base Act ("DBA"), 42 U.S.C. § 1651 et seq. (2012).[5]  AR 16.

---

1," the government responded that the Technical Exhibit was only for informational purposes. AR 357.  Similarly, in response to a question about whether the Technical Exhibit established requirements for antenna aperture and amplifier sizes, the government stated that, "[b]y the operational requirements, Technical Exhibit 1 is merely a guideline to reflect what currently works in the DVIDS integrated environment.  New [s]ystems do not have to be built to match the legacy system types."  AR 361; see also AR 359 (contractor not confined to building transmitters like the legacy systems), 360 ("This is not a proposed question, rather just a statement pulled from the informational purposes only Technical Exhibit 1."), 361 (offerors have discretion to select video compression scheme).

[5] The act applies the provisions of the Longshore and Harbor Workers' Compensation Act to the employees of American contractors who are engaged in certain types of work overseas (i.e.,

Specifically, H-8 required the awardee to provide the contracting officer with proof of DBA insurance prior to performing the contract.  AR 16 ("The contractor shall submit either proof of a valid DBA Insurance policy or acceptance of an application with CNA Insurance for the Prime and their Subcontractors at every tier prior to performance of the contract.").  The clause warned that failure to obtain insurance could constitute a material breach of its contract and lead to termination for default.  AR 17.  The clause also required offerors to agree to insert a substantially similar requirement for DBA insurance coverage "in all subcontracts (at every tier) to which DBA is applicable."  AR 16.

### D.    The Evaluation Scheme

The solicitation stated that award would be based on "the best overall (i.e. best value) proposal that is determined to be the most beneficial to the Government, with appropriate consideration given to four evaluation factors: (1) Technical, (2) Past Performance, (3) Price, and (4) Small Business Participation."  AR 54.  The Technical factor was to be the most significant evaluation factor, followed by Past Performance, Price, and Small Business Participation.[6]  AR 54.

The Technical factor contained two sub-factors: Design Specification / Technical Data Package ("TDP"), and Repair and Maintenance Plan ("RMP").  AR 54.  Under the

---

OCONUS) in support of the United States and/or its allies.  See 42 U.S.C. § 1651 (2012); Truczinskas v. Dir., Office of Workers' Comp. Programs, 699 F.3d 672, 674 (1st Cir. 2012); Serv. Employees Int'l, Inc. v. Dir., Office of Workers Comp. Program, 595 F.3d 447, 452 (2d Cir. 2010).

[6] Norsat does not challenge either the Small Business Participation or the Past Performance factors as part of this litigation.  See Pl. Mot. 7, n.2.

TDP sub-factor, the Army planned to evaluate the offerors' design and technical specifications of its proposed system under the development option. AR 54. The solicitation instructed offerors that they should "address the layout, model, features, size, and weight of the design(s) it will be submitting per the [PWS]." AR 55. The TDP sub-factor would "be evaluated by how definitive the written explanation of the design specification and technical data package of the one system capability the offeror is choosing to submit pricing and for the [vehicle mounted] and [m]aritime systems." AR 54.

Under the RMP sub-factor, the offerors were required to describe their ability to accept and respond to service requests anywhere DVIDS terminal systems are deployed on a 24/7/365 basis. AR 55. The agency planned to evaluate this sub-factor based on, among other things, the extent to which an offeror demonstrated the capability of its personnel "to travel to equipment locations throughout various areas of CONUS as well as locations OCONUS" to provide maintenance and help desk support. AR 55. Offerors were required to submit proposals that detailed their team structures and how they planned to "obtain or hire and retain the necessary qualified personnel with the requisite knowledge, skills, experience and training to successfully" perform on the contract. AR 55.

The adjectival ratings for the Technical factors were as follows:

Outstanding: Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. The proposal contains multiple strengths and no deficiencies. Risk of unsuccessful performance is very low.

Good: Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal Contains at least one strength and no deficiencies.  Risk of unsuccessful performance is low.

Acceptable: Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Proposal has no strengths or deficiencies.  Risk of unsuccessful performance is no worse than moderate.

Marginal: Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements.  Risk of unsuccessful performance is high.

Unacceptable: Proposal does not meet requirements and contains one or more deficiencies.  Proposal is unawardable.

AR 55.

For the Price evaluation, the solicitation explained that the Army would evaluate "price based on prices/costs proposed for all [contract line items ("CLINs")] and any and all other price/cost related factors required by the solicitation."  AR 56-57.  The solicitation noted the Army would perform a price reasonableness analysis for the fixed-price CLINs and other price/cost related factors, including DBA insurance for staff who would work OCONUS.[7]  See AR 47, 56-57.

### E.   Encompass's Proposal Submission

The Army received proposals from two offerors: Norsat and Encompass.  AR 517-667, 912-1051.  With regard to new DVIDS systems, Encompass proposed four systems

---

[7] Section 3.3.2 of the solicitation provided, "[f]or DBA Insurance . . . Bidders/Offerors should compute the total compensation . . . to be paid to employees who will be covered by DBA insurance . . . .  The [computed total cost] . . . and a copy of the insurance quote shall be provided with the proposal."  AR 47-48.  The solicitation further provided that "[a]ll CLINs are [Firm Fixed Price] or [Cost Plus Firm Fixed Price] in the solicitation except for shipping and DBA (OCONUS) which are No-Fee Bearing Cost CLINs."  AR 278.

to address the five different types of system capabilities as part of a . AR 930.

Specifically, Encompass proposed (1) a combined system for the Deployable and

Manpackable capabilities;[8] (2) a separate system for the Transportable capability; (3) a

separate Vehicle Mounted system; and (4) a separate Maritime system. AR 930, 1052-

53. Encompass's proposal also described a 40-pound, 65 cm X-band terminal as an

option available for future purchase, however Encompass cautioned that "[t]his solution

is not being proposed now because it operates on X-Band and the DVIDs integrated

environment is Ku-band only."[9] AR 938.

In order to address the requirement for repair and maintenance of legacy DVIDS

terminals, Encompass proposed either working with Norsat after award or, in the

alternative, developing a workaround:

> * * *.

AR 960. In addition, Encompass stated that it would leverage its teammate,

Telecommunications Systems, Inc. ("TCS"), to support existing legacy systems:

> TCS is unique in that they support all satellite terminal manufacturers,
> including General Dynamics, Wavestream, Norsat, Cisco, Panasonic,

---

[8] Encompass proposed a combined system that was "based upon the GDST Warrior SMT 1.0 meter KU/X/KA-band terminal." AR 930. As it clarified in its first proposal addendum, Encompass proposed "X-band kits [to] allow quick and easy band changes between Ku and X-band. . . . The X-band kit is packaged in a padded transit case that . . . weighs ≤ 52 lbs. Total system weight is ≤ 170 lbs. as KU-band; ≤ 222 lbs. as KU/X band." AR 1052. Encompass also stated that the MTTR would be less than 30 minutes, "assuming available spare parts." AR 934.

[9] Encompass's proposal further stated that, "Team Encompass offers an optional X-band Manpackable System based on Tampa Microwave's TM-X850MP 65cm antenna, which was specifically designed for Soldiers; it weighs only 27 lbs. and can be packed into a single, small backpack that weighs less than 40 lbs." AR 938.

Comtech, and AvL Technologies.  TCS personnel are cross-trained on all
manufacturers. . . . * * *.

AR 967.

## F.    Agency Discussions

The Source Selection Evaluation Board ("SSEB") completed three rounds of

evaluations and conducted two rounds of discussions in between those evaluations.  See

AR 759-65, 1078-89.  Both Norsat and Encompass were assigned deficiencies and/or

weaknesses, two of which are particularly relevant to the case at bar.  During the first and

second round of discussions, the Army found that Encompass's terminal help desk

proposal posed a significant risk to the government * * *.  See AR 1056, 1079, 1085,

1170-71, 1181.[10]  In its June 12, 2012 addendum to its proposal, Encompass sought, for

the second time, to address this weakness:

Encompass acknowledges the government's concerns regarding * * *
issues and, as such, we will modify our proposed support model and * * *.

AR 1063.  Encompass's addendum then proceeded to describe the qualifications of the

engineers who would staff the help desk.  AR 1063-65.  In its final Technical evaluation,

the Army stated that Encompass had "addressed the weakness * * *."  AR 1194.

In addition, the Army assigned deficiencies to both Encompass's and Norsat's

Price proposals for failing "to provide the Government with an insurance quote for the

DBA Insurance."  AR 763, 1087.  In response, both offerors identified the pages of their

---

[10] In the second round of discussions, the SSEB stated that Encompass's revised proposal to hire
three engineers instead of two, "still identifies the current DVIDS's Hub staff as the first line of
support and offers 3 not-clearly-defined-engineers/[h]elp desk technicians."  AR 1085, 1181.

initial proposals which contained their quotes for DBA insurance and attached copies to

their discussion responses.  AR 741, 744, 1069-70.  The government subsequently

concluded that both estimates were based on industry standards and found that both

proposals met the solicitation's requirements.  AR 1143, 1198.

### G.     The SSEB's Final Evaluation

In its final Technical evaluation, the SSEB credited Encompass with five strengths

across the two technical sub-factors and no weaknesses.  AR 1190-97, 1309, 1341.

Specifically, Encompass received two strengths under the TDP sub-factor for (1) the

auto-acquire technology that was included as part of the Encompass's proposed

manpackable solution, and (2) the light (40 pound) weight of the optional manpackable

single backpack X-band system.  AR 1341.  Encompass also received three RMP

strengths because (1) Encompass's partner, TCS, had 200 engineers who were already

deployed worldwide; (2) some or all of the companies on Team Encompass were

International Organization for Standardization ("ISO") 9001 or ISO 14001 certified;[11]

and (3) Encompass had already built into its workflow the use of the "Transmitter

Tracker" system.  AR 1309, 1341.  Encompass was assigned a score of "Good-Low

---

[11] As discussed infra, the parties dispute the basis of Encompass's strength for ISO certification.
The June 27, 2012 Technical evaluation worksheet prepared for Encompass by the SSEB stated
that "[t]he proposal contains a Strength.  All Vendors are ISO certified Equipment manufacturers
and repair/maintenance partner companies [are] all ISO 9001 or 14001 certified."  AR 1196.
The award brief to the SSA, dated September 19, 2012, stated that "[a]ll vendors are ISO
certified [e]quipment manufacturers and repair/maintenance partner companies are all ISO 9001
or 14001 certified."  AR 1309.  The SSEB summary report that was provided to the SSA on or
before September 25, 2012, AR 1351, stated that, "[Encompass] and all subcontractors are all
ISO 9001 or 14001 certified."  AR 1341.  Notably, the source selection decision document
signed by the SSA on September 28, 2012 does not discuss ISO certifications whatsoever.  See
AR 1353-57.

Risk" for each sub-factor and an overall Technical score of "Good-Low Risk." The SSEB noted that Encompass's proposal was "Good," and not "Exceptional," because the "strengths, while potentially advantageous to the Government, are not such that they will provide immediate, material benefit and as such, do not elevate the overall proposal higher than Good-Low Risk." AR 1341.

Norsat received four strengths under the TDP sub-factor, five strengths under the RMP sub-factor, and no weaknesses or deficiencies. AR 1342-43. As a result, Norsat received an "Outstanding-Risk Very Low" rating for both technical sub-factors and for its overall technical rating. AR 1343. The SSEB's evaluation across all criteria is reproduced in the table below:

|  | Encompass | Norsat |
|---|---|---|
| Overall Technical | Good – Risk Low | Outstanding – Risk Very Low |
| (a) Design Specification / TDP | Good – Risk Low | Outstanding – Risk Very Low |
| (b) Repair & Maintenance Plan | Good – Risk Low | Outstanding – Risk Very Low |
| Past Performance | Substantial Confidence | Substantial Confidence |
| Small Business Participation | Marginal | Marginal |
| Price | $* * * | $* * * |

AR 1350. On or about September 25, 2012, the SSEB's report was forwarded to the Source Selection Authority ("SSA") to help make a final award decision. AR 1351.

## H.    The SSA's Final Decision and Award to Encompass

On September 28, 2012, the SSA decided that, despite Norsat's higher-rated Technical proposal, Norsat's nearly * * * 36.2 %—price premium made Encompass's proposal the best value to the government. AR 1357. In her findings, the SSA stated that she had received a detailed briefing from the Procuring Contract Officer ("PCO") on the

SSEB analysis and had reviewed the SSEB report. AR 1354. The SSA then compared

the offerors based on the evaluation criteria. AR 1354-57. The evaluation results across

all evaluation criteria are summarized below:

|  | **Encompass** | **Norsat** |
|---|---|---|
| Overall Technical | Good – Risk Low | Outstanding – Risk Very Low |
| (a) Design Specification / TDP | Good – Risk Low | Outstanding – Risk Very Low |
| (b) Repair & Maintenance Plan | Good – Risk Low | Outstanding – Risk Very Low |
| Past Performance | Substantial Confidence | Substantial Confidence |
| Small Business Participation | Marginal | Marginal |
| Price | $* * * | $* * * |

AR 1354.

After noting that neither offeror's Technical proposal received any deficiencies or

weaknesses, the SSA discussed the benefits of each offerors' Technical solution. AR

1354. For example, the SSA described how Encompass's "technical data package for the

man-packable, portable 40 pound-system is a benefit to the government due to the

system's small size and low weight." AR 1355. The SSA also explained that the

inclusion of auto-acquire technology in the manpackable solution was unique to

Encompass and would "dramatically lessen the difficulty and time required to move the

dish up and down and polarize it to connect with the correct satellite."[12] AR 1355. With

regard to Encompass's RMP, the SSA recognized a strength based on the geographic

---

[12] Encompass proposed a combined deployable/manpackable terminal with an auto-acquire motorized antennae that, according to Encompass's proposal, enables an operator to push "a single button to deploy, acquire the target satellite, and begin transmitting." AR 930-31. Although Norsat proposed auto-acquire technology for its motorized terminals, AR 554, neither Norsat's deployable (i.e., DVIDS A BLOCK III) nor its manpackable system (i.e., DVIDS C BLOCK III) clearly indicated the use of a motorized terminal and/or auto-acquire technology. See AR 554-557 (DVIDS A BLOCK III description), 562-65 (DVIDS C BLOCK III description).

distribution of TCS's 200 employees.  AR 1356.  Norsat's technical proposal was recognized for three strengths under the TDP sub-factor and four strengths in the RMP sub-factor.  AR 1355-56.

Both Norsat and Encompass received the same scores for their Past Performance (Substantial Confidence) and Small Business (Marginal) proposals.  The SSA stated that she had reviewed multiple Past Performance questionnaires submitted for each proposal, as well as information in the government's Past Performance Information Referral System ("PPIRS").  The SSA noted that both Norsat and Encompass had "received a number of favorable comments from respondents . . . and in the PPIRS.  There was no indication in the past performance assessments that would bring into question an award to either offeror."  AR 1356.  The SSA concluded that, "[i]t is my position that there is substantial confidence that either offeror . . . can successfully perform the requirements of the solicitation."  AR 1356.  In addition, both proposals received a "Marginal" rating for the Small Business Participation factor because "their proposed small business participation percentages fell significantly below the 13% goal (8.1% for [Encompass]; and 6.7% for [Norsat]."  AR 1356.

With regard to Price, Norsat's proposal of * * * was * * * more expensive than Encompass's.  AR 1357.  The SSA stated that, following a cost realism analysis performed on the DBA insurance, no cost adjustment was made.  AR 1357.  Summarizing the price evaluation, the SSA concluded that "the price difference stems primarily from the forces of competition and each offeror's approach to satisfying the Government's requirements."  AR 1357.

16

After acknowledging the relative importance of each of the evaluation criteria, the

SSA stated why Norsat's higher Technical score did not justify award:

> I recognized the benefits in [Norsat's] proposal. However I did not find enough benefit in [Norsat's] proposal that would be worth the additional * * * premium of 36.2%. I also note that Section M of the solicitation stated that the closer the ratings are in the non-price factors, the more significant Price becomes.

AR 1357. Based on this analysis, the SSA determined that Encompass's proposal

represented the best value to the government. AR 1357. Award was made on September

28, 2012, AR 1358, and Norsat received a debriefing on October 9, 2012. AR 1412.

## I.     The GAO Protest

Also on October 9, 2012, Norsat filed a protest with the United States Government

Accountability Office ("GAO"), as well as supplemental protests on October 19, 2012

and November 19, 2012. AR 1443, 1471, 1552. The protest challenged several aspects

of the award, such as the agency's alleged deviation from the solicitation's evaluation

scheme, failure to conduct a proper Technical evaluation, and failure to conduct a proper

Past Performance evaluation. AR 1455, 1457, 1477. The protest was withdrawn on

January 8, 2013. Intervenor Mot. 13, Gov. Mot. 9.

## J.     The Instant Litigation

Invoking the court's Tucker Act Jurisdiction under 28 U.S.C. § 1491(b)(1) (2012),

Norsat timely filed this action on January 16, 2013 and moved for a Temporary

Restraining Order ("TRO") and a preliminary injunction. ECF No. 2 (TRO); ECF No. 3

(preliminary injunction). The court granted Encompass's motion to intervene on January

17, 2013. Order, ECF No. 11. Following a status conference with the parties on January

17

18, 2013, the court denied the plaintiff's motion for a TRO and the parties agreed to consolidate the plaintiff's motion for a preliminary injunction with its cross-motion for judgment on the administrative record. Order, ECF No. 13. On February 13, 2013, the government moved to strike portions of the declaration of a * * *, a Norsat Vice President, which had been attached to the plaintiff's complaint. Motion to Strike, ECF No. 28. Briefing on all motions was completed on March 1, 2013, and argument was heard on March 18, 2013.

## II.   DISCUSSION

### A.   Standard of Review

This court's bid protest jurisdiction extends to actions "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). In such cases, the court's role is defined by the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012). See 28 U.S.C. § 1491(b)(4) (adopting APA standard of review). Under the APA standard, the court asks whether the agency's decision was "within the bounds of reasoned decisionmaking." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983). Thus, an award will not be set aside unless the plaintiff carries its burden of showing that the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Banknote Corp. of Am., v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (citations omitted).

In bid protest cases, the court can set aside an award as arbitrary or capricious if the plaintiff carries the burden of showing that either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009). Under the first prong, the plaintiff carries a "heavy burden" of demonstrating that the contracting agency failed to provide "a coherent and reasonable explanation of its exercise of discretion." Banknote, 365 F.3d at 1351. Even when a plaintiff demonstrates that a procurement official acted irrationally, the plaintiff must demonstrate that, as a factual matter, the official's conduct was prejudicial. See BINL, Inc. v. United States, 106 Fed. Cl. 26, 36 (2012) (quoting Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).

When analyzing procurement decisions, agency officials are afforded substantial latitude "to determine which proposal represents the best value for the government," E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996), and this court presumes that procurement officials "perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations . . . ." Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002). Moreover, the court generally will not second guess an agency's assessment of risk stemming from the chosen procurement strategy or a particular offeror's capacity to perform. See CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1356 (Fed. Cir. 2008) (agency provided rational basis for conclusion that de-bundling procurement posed unacceptable risk); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1337-38 (Fed. Cir. 2001) (evidence

that winning contractor was subject to improper control was sufficient to rebut presumption of regularity as to agency's conclusion regarding contractor's responsibility).  "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ."  Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

Alternatively, a protester can prevail by showing that it was prejudiced by a clear violation of applicable statutes or regulations.  See Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1331-32).  The prejudice caused by the violation must be "significant" in order to warrant setting aside the award.  See Bannum, 404 F.3d at 1354. Put another way, a protester must show that there was a "substantial chance" it would have received the contract award in the absence of the agency's error.  See id. at 1358; Banknote, 365 F.3d at 1351.

### B.      The Army's Technical Evaluation Was Not Arbitrary, Capricious, an Abuse of Discretion, or Contrary to Law

The plaintiff contends that the Army's Technical evaluation was arbitrary, capricious, and an abuse of discretion—and that the best-value determination must therefore be set aside—because Army officials (1) did not require Encompass to propose a system that conformed to the weight and MTTR "requirements" found in the Technical Exhibit; (2) did not require Encompass to propose a help desk solution that would be fully staffed on the date of award; (3) unreasonably relied on alleged material misrepresentations made by Encompass in reaching a best value determination; (4)

provided briefing slides to the SSA that incorrectly credited Encompass (or its teammates) with ISO 9001 or 14001 certifications; and (5) credited a portion of Encompass's proposal with a strength in violation of the solicitation's requirements. Because, for the reasons discussed below, the record demonstrates that (1) the Army had a coherent and reasonable explanation for rating Encompass's Technical proposal as "Good-Low Risk" and (2) the SSA's single error in evaluating Encompass's Technical proposal was not significantly prejudicial to Norsat, the court concludes that the Army's Technical evaluation was not arbitrary, capricious, an abuse of discretion, or contrary to law.

### 1. The Army's Conclusion that Encompass's Deployable/Manpackable Solution Complied with the Solicitation's Technical Requirements Was Not Irrational

The plaintiff contends that the government abused its discretion by waiving or relaxing the solicitation's 220-pound weight and 30-minute MTTR "requirements" when it evaluated Encompass's proposal. Pl. Mot. 18-21. Specifically, the plaintiff argues in its briefs that the plain language of the Technical Exhibit set forth general design parameters that could only be avoided in cases where "a specific design component or parameter was specifically stated." Pl. Reply 3-6. For example, the plaintiff contends that the use of the word "shall" and/or "maximum" in connection with the Technical Exhibit's discussion of weight and MTTR created mandatory design parameters. Id. Given this reading, the plaintiff concludes that the Army abused its discretion in accepting Encompass's proposal because it "ignored the fact that Encompass's proposed Manpackable system . . . exceeded the 220 pound weight limit." Pl. Mot. 19. The

government and defendant-intervenor counter that the plain language of the solicitation unambiguously stated that Technical Exhibit 1 was for informational purposes only and was therefore not binding on Encompass.  See Gov. Mot. 17-18; Intervenor Mot. 18-19. As such, the Army was under no obligation to enforce the specific weight or MTTR requirements set forth in the Technical Exhibit.

The court agrees with the government and the defendant-intervenor and concludes that the solicitation did not establish binding weight or MTTR requirements.  A review of the record demonstrates that the Technical Exhibit was for informational purposes only and did not establish detailed requirements for the new DVIDS terminals.  As such, the government did not abuse its discretion when it evaluated Encompass's proposal.

The solicitation makes clear that offerors were to have broad latitude in proposing solutions that differed from Norsat's DVIDS systems.  The PWS stated, in part, that "[the c]ontractor is not confined to the technical means by which the legacy systems operate as long as the capabilities below are met.  [The c]ontractor is not confined to building transmitter or transmitter types that are like the legacy systems."  AR  449.  The PWS then enumerated 11 capabilities that broadly defined the required functionality of the new DVIDS systems—none of which included the specific weight or MTTR requirements identified in the Technical Exhibit.  AR 449.  In fact, only requirements 5 and 10 even

indirectly implicated size or mobility requirements and Encompass's proposal conformed to those requirements.[13]

More importantly, however, the introduction to the Technical Exhibit specifically stated that it wasn't binding. The words "For Informational Purposes Only" are written in bold print at the top of the page, indicating that the agency intended—as it had twice stated in the body of the PWS—that the Technical Exhibit did not serve to create binding requirements. AR 450, 464. In addition, the introduction states that, "SATCOM systems acquired over the performance period of this contract must conform as closely as possible to the operational parameters of the current systems." AR 464 (emphasis added). These words expressly contemplate the possibility that offerors could deviate from the operational parameters described therein and still meet the PWS requirements. This view is confirmed by other language in the introduction to the Technical Exhibit, which states that, "[f]or the purposes of [the solicitation], there is no restriction to use any legacy system component associated with this requirement. Any reference to legacy system equipment or name brand components is strictly as an example (e.g. Ku-Band PPL 100HA (Norsat) LNA, Panasonic CF-18 laptop)." AR 464. In the face of the unambiguous language in the PWS and Technical Exhibit, the plaintiff's argument that the Technical Exhibit by its terms created binding requirements against which to judge Encompass's proposal cannot be sustained.

---

[13] Requirement 5 stated that, "Transmitter or Transmitter type must be able to mount on a vehicle and a maritime vessel at sea." AR 449. Requirement 10 stated that, "Depending on military unit using the transmitter or transmitter type, size, weight and portability will be a factor." AR 450.

The court acknowledges that there are places where the Technical Exhibit identifies certain components of the legacy system by name, and thus offering a different component from those identified in the Exhibit might have raised issues.  See AR 489 (listing Microsoft Windows operating system).  However, legacy or name brand components were not mentioned in the MTTR or weight specifications, and therefore this argument is not necessary to resolve the case at bar.  See AR 467 (A-MTTR), 473 (A-weight), 477 (B-MTTR), 482 (B-weight), 486 (C-MTTR), 492 (C-weight), 496 (D-MTTR), 503 (D-weight), 507 (E-MTTR), 514 (E-weight).

Finally, the extensive record of questions and answers between the agency and the offerors on the significance of the Technical Exhibit confirm the government's position. In response to a question about whether it was "the government's intent that the contractor's proposal provides answers and pricing for all "shall" statements in Technical Exhibit 1 . . . or is Technical Exhibit 1 for informational purposes only?" the agency responded, "Technical Exhibit 1 is only for informational purposes as now stated in the PWS."  AR 357.  Similarly, in response to a question about whether the Technical Exhibit established requirements for antenna aperture and amplifier sizes, the agency stated that, "[b]y the operational requirements, Technical Exhibit 1 is merely a guideline to reflect what currently works in the DVIDS integrated environment.  New systems do not have to be built to match the legacy system types."  AR 361 (emphasis added).

Put simply, because the Technical Exhibit did not create binding requirements for the weight or MTTR of new terminals, the plaintiff's argument that the Army abused its

discretion by failing to enforce such "requirements" and find Encompass's proposal non-conforming is without merit.[14]

### 2. The Army's Conclusion that Encompass's Help Desk Solution Complied with the Solicitation's Requirements Was Not Irrational

Next Norsat argues that the Army's conclusion that Encompass's proposal—* * *—satisfied the PWS's help desk requirements was irrational.  See Pl. Mot. 22-23; Pl. Reply 8-10.  In response, the government and defendant-intervenor argue that the government's decision was supported because the solicitation expressly contemplated post-award hiring, as evidenced by the statement "[t]he Offeror shall include details that demonstrate its ability to . . . [o]btain or hire and retain the necessary qualified personnel with the requisite knowledge, skills, experience and training to successfully execute the requirement[.]"[15]  Gov. Mot. 20 (citing AR 45); Intervenor Mot. 22.

_____

[14] In light of the clear language of the PWS, Technical Exhibit, and the answers to the Q&A, this court does not reach the question of whether statements by the Procuring Contracting Officer, SSEB, and SSA describing Encompass's proposed systems as below the "maximum" weight somehow transformed the Technical Exhibit into a requirements document.  See Pl. Reply 4-7 (quoting AR 1547).  The court notes, however, that the solicitation made clear that terminal weight was a factor—albeit not a specific minimum or maximum requirement—in evaluating technical proposals.  See AR 450 ("Depending on [the] military unit using the transmitter or transmitter type, size, weight and portability will be a factor.").  The court also does not reach the question of whether, as the defendant-intervenor contends, Norsat failed to show prejudice because, "Norsat's proposed Type C system weighs 247 pounds when the X-band module is added."  Intervenor Reply 7-8.

[15] The government alternatively moves to dismiss the plaintiff's arguments related to Encompass's proposed help desk solution on the ground that the plaintiff is actually objecting to the awardee's ability to perform under the contract, which is a matter of contract administration.  Def. Mot. 12-14.  Because the plaintiff's challenge is properly understood as an objection to the agency's Technical evaluation of Encompass's proposal, jurisdiction is proper under 28 U.S.C. § 1491(b).  Therefore the court **DENIES** the government's motion to dismiss this claim.

The court again agrees with the government and defendant-intervenor that the Army's evaluation and acceptance of Encompass's proposed help desk solution was not irrational on the grounds that it presented an unreasonable risk.  Contrary to plaintiff's contentions, the PWS did not expressly state that all help desk hiring must be completed as of the date of award.  Rather, offerors were required to explain how they planned to "obtain or hire and retain" the necessary personnel to staff the help desk capability.  AR 45.  It is true, as the plaintiff notes, that the Army initially questioned Encompass's help desk proposal on the grounds that it posed a significant risk to the government.  See AR 1063-65, 1194.  Eventually, however, the government accepted Encompass's proposal * * *.  AR 1063.  In its final analysis, the Army determined that Encompass's proposal met the requirements for help desk staffing without presenting an unacceptable risk to the government.  AR 1194.

At core, the plaintiff's disagreement with the Army is over its assessment of the risk associated with postponing some help desk hiring until after award.  This court, however, must generally defer to an agency's assessment of risk that accompanies a given procurement strategy.  See CHE Consulting, 552 F.3d at 1356.  Where, as here, Encompass proposed a facially plausible means to "ensure [that] access to a helpdesk technician is possible," and the record demonstrates that the Army thoughtfully considered the risks associated with that approach, this court cannot second-guess the correctness of the SSA's decision.[16]  See Honeywell, 870 F.2d at 648.

---

[16] The court also rejects the plaintiff's argument that the government treated the offerors unequally when it accepted Encompass's proposal to hire help desk staff after award, but refused

### 3.  The Army's Conclusion that Encompass Could Meet the Legacy System Repair and Maintenance Requirements Was Not Irrational

The plaintiff argues that the award to Encompass must be overturned because (1) Encompass intentionally made a false statement in its proposal and (2) the Army relied on that statement in making its award.  See, e.g., GTA Containers, Inc. v. United States, 103 Fed. Cl. 471, 483 (2012); Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006), aff'd 492 F.3d 1308 (Fed. Cir. 2007).  In general, Norsat disputes the veracity of several statements in Encompass's proposal that indicated that Encompass would be able to perform maintenance and processing of all DVIDS legacy software and spare parts within 15 days of contract award.[17]  Pl. Mot. 27-31.  Relying on GTA

---

to give Norsat credit for its plan to increase small business participation after award.  In the absence of contrary language in the solicitation, the Army's decision not to credit—as part of the Small Business Participation evaluation—an offeror's intent to increase future small business participation has no bearing on the propriety of the Army's Technical evaluation.

[17] In support of this contention, the plaintiff attached to its complaint a declaration of * * *, who is the Vice President, Satellite Sales, North America, of Norsat International.  See ECF No. 1 Pages 548-54.  On February 13, 2013, the government moved to strike paragraphs 3-19 of the declaration.  See Motion to Strike, ECF No. 28.  The government argues that (1) the plaintiff failed to file a proper motion to supplement the administrative record, (2) the material is not necessary for effective judicial review, and (3) the material in paragraphs 15-17, and paragraph 19, includes impermissible hearsay.  Def. Mot. Strike 4-6.

The court concludes that, in this unique case, resort to extra-record information in paragraphs 1-7, 9-11, 15, and 17-18 of the * * * Declaration is necessary for effective judicial review.  The plaintiff's material misrepresentation theory is premised on the steps that the plaintiff took to prevent others (including the awardee) from gaining knowledge of the proprietary technology that was central to a key aspect of the procurement at issue.  As such, information concerning those steps based on * * * personal knowledge may be considered by the court to determine whether, as the plaintiff essentially contends, it was technologically impossible for any offeror other than Norsat to claim that it intended to service the legacy systems without Norsat's participation.  See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009).

Containers, 103 Fed. Cl. 471 and Johnson Controls Sec. Sys., B-296490, B-296490.2,

2007 CPD ¶ 102 (Comp. Gen. 2005), the plaintiff asserts that, because the SSA did not

properly consider how Encompass could execute its proposal without Norsat's

cooperation, which Encompass knew Norsat had refused to offer, the SSA's reliance on

Encompass's representations must be re-evaluated.

The plaintiff begins by claiming that, because Norsat had twice rejected

Encompass's overtures to establish a teaming arrangement, Encompass's proposal falsely

represented that it would partner with Norsat.[18]  A fair reading of Encompass's proposal,

however, demonstrates that Encompass did not actually represent to the Army that Norsat

would be an Encompass teammate.  Rather, Encompass proposed that it would either

contract with Norsat after award or, failing that, Encompass would "develop a GUI

interface to operate with the legacy systems . . . ."  AR 960.  As the government correctly

notes, Encompass's proposal did not list Norsat as a member of its team.[19]  Gov. Mot 26

---

By contrast, the statements by * * * speculating as to the capabilities of Encompass (or its teammates) are not based on personal knowledge and will not be considered.  Thus the remaining paragraphs (8, 12-14, 16, and 19-23) are stricken.  In addition, the court will scrupulously disregard those portions of paragraphs 6, 9, 10, 11, and 17 in which* * * speculates as to the capabilities of third parties to service legacy DVIDS equipment.  Accordingly, the government's motion to strike is **GRANTED-in-PART** and **DENIED-in-PART**, and the plaintiff's motion to supplement the administrative record is **GRANTED-in-PART** and **DENIED-in-PART**.

[18] According to * * *, prior to submitting a proposal in this procurement, "Encompass contacted Norsat on two occasions to request that Norsat team with Encompass as a subcontractor to Encompass, which Norsat declined, and had made clear to Encompass that it would not collaborate with it in any way on the Solicitation."  * * *. ¶ 17.

[19] The government alternatively moves to dismiss the plaintiff's arguments related to Encompass' ability to repair and maintain legacy systems within the 15-day period specified in

(citing AR 921-26).  By contrast, the awardees in <u>GTA Containers, Inc.</u> and <u>Johnson Controls</u> made affirmative—and false—representations about specific actions that they had taken prior to submitting their proposals.[20]  As such, these cases are distinguishable.

In addition, the plaintiff has failed to carry its burden of demonstrating that Encompass materially misrepresented that TCS personnel could support Norsat equipment.  Although * * *, a Vice President of Norsat, lists various steps Norsat has taken to prevent third parties from gaining access to Norsat's proprietary technology (for example, * * * states that "Norsat has trained only two individuals in the private sector on the repair and maintenance of the DVIDS equipment . . . ." * * *. ¶ 6,[21] there is no reason to believe that TCS employees were not trained by parties who had received Norsat-led

---

the contract on the ground that the plaintiff is actually objecting to the awardee's ability to perform under the contract.  As discussed, because the plaintiff's challenge is properly understood as an objection to the agency's Technical evaluation of Encompass' proposal, jurisdiction is proper under 28 U.S.C. § 1491(b).  Therefore the court **DENIES** the government's motion to dismiss this claim.

[20] In <u>GTA Containers</u>, the parties agreed that the defendant-intervenor had represented that a particular subcontractor was being offered as a component part supplier, despite the absence of an intent or agreement to do so.  103 Fed. Cl. at 485-86.  In <u>Johnson Controls</u>, the awardee's proposal claimed that it was "working with [a vendor] to obtain the certifications required by the RFP . . . .", however the awardee later admitted that it had not arranged or coordinated with the necessary vendor to obtain such certifications.  2007 CPD ¶ 102, at *5-6.

[21] According to * * *, (1) Norsat holds patents in the equipment and software used by the DVIDS program; (2) Norsat does not subcontract support on its technology to third parties; (3) third party manufacturers are prohibited from selling Norsat equipment to non-Norsat entities; (4) Norsat has only trained two individuals in the private sector on the repair and maintenance of DVIDS equipment; (5) Norsat's licensing agreement with the government prevents the government from making changes or accessing certain DVIDS software; (6) Norsat manufactures most of the spare parts for DVIDS equipment; (7) DVIDS equipment training manuals are proprietary to Norsat, which has not licensed the manuals to third parties; and (8) Norsat does not sell its custom spare parts unless it performs the repair and maintenance service.  <u>See</u> * * *. ¶¶ 3-9, 10-11, 18.

training or that TCS engineers were not otherwise capable of designing software to run the legacy system.

Similarly, the plaintiff has failed to demonstrate that it was irrational for the Army to conclude that Encompass would be able, with or without Norsat's support, to provide repair and maintenance on legacy DVIDS systems within 15 days of award.  Apart from * * *statement that Norsat does not allow its source code to be distributed, the plaintiff offers no evidence to establish that Encompass (or its teammates) would be unable to perform as proposed.  Indeed, during oral argument counsel for the plaintiff conceded that it could be possible for a sophisticated company like Encompass to develop such software within a brief period.  Given the undisputed record evidence of the quality of TCS's engineers, the plaintiff's evidence does not raise serious questions about the veracity of this or any other element of Encompass's proposal.  As such, the plaintiff has failed to establish that the SSA relied on a material misrepresentation when she decided to award the contract to Encompass.

### 4.    The SSEB's Characterization of Team Encompass's ISO Certifications Did Not Significantly Prejudice Norsat

The plaintiff also argues that the court must set aside the award to Encompass because the SSEB provided materials to the SSA that inaccurately stated that Encompass and some of its other teammates held various ISO certifications.  Pl. Mot 24-25; Pl. Reply 10-12.  Relying on Huntsville Times Co., v. United States, 98 Fed. Cl. 100, 119 (2011), the plaintiff claims that "it is well established if an SSEB erroneously concludes that an awardee has a strength, and that conclusion is provided to the SSA in the reports and

briefings, and the SSA makes no disagreement with the SSEB's conclusion, the award

decision must be overturned."  Pl. Reply 12.  Based on this authority, the plaintiff draws

attention to a concededly inaccurate statement in the SSEB's summary document:

"[Encompass] and all subcontractors are all ISO 9001 or 14001 certified."  Pl. Mot. 25

(citing AR 1341).  In addition, the plaintiff disputes the accuracy of a slide in the SSEB's

briefing package, which credited Encompass with a strength because "[a]ll Vendors are

ISO certified Equipment manufacturers and repair/maintenance partner companies are all

ISO 9001 or 14001 certified."  Pl. Reply 11 (citing AR 1309).  Norsat contends that

because the SSA did not address these misstatements in her source selection decision

document, the Army "erroneously inflated Encompass's qualifications," and that this

"incorrect finding was a material factor in the best value analysis."  Pl. Mot. 25.

In response, the government argues that the factual misstatement in the SSEB's

summary document (i.e., that Encompass was ISO-certified) was actually corrected in the

briefing materials provided to the SSA.  Gov. Mot. 22.  The government and defendant-

intervenor further contend that, read in context, the SSEB's briefing slides were accurate

and reasonable because the companies that were proposed as the principle equipment

manufacturers or repair/maintenance partner companies (i.e. General Dynamics

SATCOM Technologies, Tampa Microwave, and TCS) did, in fact, possess the

certifications for which the SSEB credited Encompass.  Intervenor Mot. 26; Gov. Mot.

10-11.  The government and defendant-intervenor further note that Norsat has failed to

demonstrate prejudice in light of the absence of any reference to ISO certification in the

SSA's source selection document.  Gov. Mot. 23; Gov. Reply 12-13; Intervenor Mot. 27; Intervenor Reply 11-13.

Regardless of whether the SSEB included Encompass among the list of contractors having ISO certifications in the briefing slides, the plaintiff's argument ultimately fails because Norsat has not demonstrated "significant prejudice."  It is well established that a party cannot prevail in a bid protest unless it establishes that it has been significantly prejudiced by the agency action being challenged.  See BINL, Inc., 106 Fed. Cl. at 36; Weston Solutions, Inc. v. United States, 95 Fed. Cl. 311, 322 (2010) (citing Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009)).  It is not enough for Norsat to prove that the SSEB made an erroneous statement to the ultimate decision-maker.  See Huntsville Times, 98 Fed. Cl. at 119-21 (determination of whether SSA relied on evaluation committee's errors necessary prior to granting plaintiff relief). Rather, Norsat must demonstrate that the SSA relied on the erroneous statement(s) in reaching her ultimate decision to award the contract to Encompass.  See id.  In other words, Norsat must show that the SSA's decision lacked a rational basis supported by the record such that, but for the SSA's reliance on the SSEB's errors, Norsat would have had a substantial chance of receiving the award.

In this case, the SSA awarded Encompass a total of three technical strengths. Under the TDP sub-factor, Encompass was recognized for the small weight of its X-Band only pack, as well as the auto-acquire technology used in its deployable/manpackable solution.  In addition, Encompass received a strength under the RMP sub-factor in recognition of the wide geographic distribution of TCS's employees.  Nowhere in the

source selection decision document did the SSA indicate that ISO certification played a role in her decision.  Thus, even if the court assumes that the SSEB should not have given Encompass a strength based on its ISO certifications (which is not certain given the certifications of its team members), this would not change the three strengths (and absence of deficiencies) that were the basis of the SSA's decision.  As noted, the criteria for a rating of "Good-Low Risk" was that the offeror received no deficiencies and at least one strength.  Encompass was therefore entitled to its rating.  Norsat has failed to provide the court with a suitable justification for concluding that, but for the SSEB's misstatements, Encompass's technical evaluation would have been downgraded and Norsat would have had a substantial chance of receiving the award.  Therefore the court must agree with the government and defendant-intervenor that Norsat has failed to demonstrate the significant prejudice necessary to warrant granting relief.

**5.    The SSA's Decision to Evaluate Encompass Based Partly on an Optional 40-Pound Manpackable System Did Not Significantly Prejudice Norsat**

At oral argument, counsel for the plaintiff asserted for the first time that it was impermissible for the Army to credit Encompass with a strength based on Encompass's proposed option for a future 40-pound X Band DVIDS system.  Specifically, the plaintiff argued that this option was not listed separately in the pricing matrix, and therefore could not be a proper basis for receiving a strength.  In response, the government directed the court to a page in Encompass's proposal that stated that, "[t]his X-band terminal can be substituted for the current terminal on CLIN 0009AB on Attachment 0002 Pricing Matrix at an identical price."  AR 938.  The government argued that, because Encompass had

provided a means to determine the pricing for the X-band terminal, it was proper for the SSA to credit Encompass with an additional strength.

The court concludes that although the 40-pound terminal might be highly beneficial to the government, Encompass should not have received a strength under the solicitation's terms. It is axiomatic that an agency must assess the relative qualities of competitive proposals "solely on the factors and subfactors specified in the solicitation." 48 C.F.R. §§ 15.305(a), 15.308. The solicitation stated that the TDP sub-factor would "be evaluated by how definitive the written explanation of the design specification and technical data package of the one system capability [for which] the offeror is choosing to submit pricing . . . ." AR 54. None of the terminals that Encompass proposed for any of the system capabilities consisted of a 40-pound terminal that operated in X-band only. AR 930. In fact, Encompass's proposal stated that the 40-pound terminal was "not being proposed now because it operates on X-Band and the DVIDs integrated environment is Ku-band only." AR 938.

In her source selection decision document, the SSA stated that Encompass's "man-packable, portable 40 pound system is a benefit to the Government due to the system's small size and low weight." AR 1355. Based on this statement the SSA does not appear to have been referring to the integrated multi-band solution that was actually proposed as Encompass's combined Deployable/Manpackable system capability.[22] In this

_____

[22] The defendant-intervenor's motion for judgment confirms that the 40-pound terminal was not what Encompass actually proposed as part of its manpackable system. See Intervenor Mot. 19 (describing the X-band module of its proposed manpackable solution as, "a separate module [that] weighs 52 pounds").

circumstance, the SSA erred in crediting Encompass with a strength for an item it proposed for the future but was not part of its current proposal.[23]

Notwithstanding this error, Norsat has failed to demonstrate how it was prejudiced.  As noted, <u>supra</u>, the criteria for a Technical score of "Good—Low Risk" was the absence of any weaknesses/deficiencies and the presence of one or more strength. Even eliminating Encompass's TDP strength for the 40-pound terminal, Encompass still would have received a TDP strength for its auto-acquire technology and a RMP strength for the wide geographic coverage of its proposed TCS staff.  In other words, Encompass still would have qualified for a "Good—Low Risk" overall rating.  In such circumstances, the SSA's overall Technical evaluation of Encompass would not have changed and Norsat has again failed to establish significant prejudice.  Accordingly, Norsat's argument must be rejected.

## C.  The Army's Evaluation of Encompass's Price Proposal Was Not Arbitrary, Capricious, an Abuse of Discretion, or Contrary to Law

The plaintiff contends that the agency's evaluation of price was improper because Encompass was not required to provide proof of its own DBA insurance policy.  <u>See</u> Pl. Mot. 23.  According to the plaintiff, the plain language of the solicitation required that offerors provide proof of DBA insurance for the prime and all subcontractors.  Norsat contends that by accepting Encompass's price proposal despite the absence of a proper

---

[23] The court cannot accept the government's argument that, because Encompass's proposal stated that the 40-pound terminal would be offered at the same price as the proposed (and priced) Manpackable/Deployable system, the 40-pound terminal was a proper basis for award.  The SSA's ability to ascertain the future terminal's price does not change the fact that Encompass expressly did not include the 40-pound terminal in its official proposal.

quote for the cost of DBA insurance for Encompass, the agency failed to conduct a

proper cost reasonableness analysis.  In response, the government argues that acquisition

of appropriate DBA insurance is a matter of contract administration, and therefore is not

a proper basis for relief.  Def. Mot. 5, 12-14.  Moreover, the government contends, the

DBA insurance requirement applies only to contractors who will be operating OCONUS,

and Encompass offered proof of DBA insurance for the only teammate—TCS—who was

proposed for OCONUS work.[24]  Further, the government asserts that, even if

Encompass's failed to properly account for the cost of DBA insurance, the cost is so

small that any prejudice to Norsat was <u>de minimis</u>.  Gov. Mot. 32.

      The court agrees with the government that the solicitation only required offerors to

address the cost of DBA insurance for teammates that were proposed for OCONUS work.

Section 3.3.2 of the solicitation implicitly recognizes that some employees would not be

covered by the DBA insurance requirement.  AR 47-48 (offerors must compute

compensation paid to employees who will be covered).  <u>See also</u> AR 278 ("All CLINs are

[Firm Fixed Price] or [Cost Plus Firm Fixed Price] in the solicitation except for shipping

and DBA (<u>OCONUS</u>).") (emphasis added).  As such, the Army's price evaluation of

Encompass's DBA insurance costs would not be erroneous unless they excluded costs for

---

[24] The government alternatively moves to dismiss the plaintiff's arguments related to
Encompass's acquisition of DBA insurance on the ground that the plaintiff is actually objecting
to the awardee's ability to perform under the contract.  Because the plaintiff's challenge is
properly understood as an objection to the agency's evaluation of Encompass's proposal,
jurisdiction is proper under 28 U.S.C. § 1491(b).  Therefore the court **DENIES** the government's
motion to dismiss this claim.

teammates who were proposed for OCONUS work.[25] Because the plaintiff has not demonstrated that Encompass specifically proposed to use any of its teammates (other than TCS) for OCONUS work, the plaintiff has failed to demonstrate that the SSA erred.[26]

Moreover, even if Encompass had been required to provide a DBA insurance quote for every member of the Encompass team, Norsat has failed to demonstrate sufficient prejudice in the price evaluation to overturn the award. Norsat's quoted price for DBA insurance was * * *, which was * * * less than Encompass's quoted price of * * *. AR 1439. Even multiplying Encompass's insurance quote by a factor of ten, the difference in total cost between Encompass's and Norsat's DBA insurance would only have been * * *. This would represent approximately .38% of the total difference in price between the offerors. This minimal sum would not be sufficient to overturn an award that will save the government * * *.[27]

---

[25] The court rejects the plaintiff's argument that various DoD Policy Instruction Letters required Encompass to propose DBA insurance for itself and its other teammates. See Pl. Reply 13-14. Even assuming that the court would construe these letters in a manner beneficial to Norsat, the plaintiff has failed to establish that these letters carry the force of law. See Hamlet v. United States, 63 F.3d 1097, 1105 (Fed. Cir. 1995) (articulating test for determining whether agency pronouncement carries force of law); Frazier v. United States, 79 Fed. Cl. 148, 164 (2007) (solicitation prospectus did not carry force of law) aff'd, 301 F. App'x 974 (Fed. Cir. 2008).

[26] Norsat's argument that the Army treated Norsat differently from Encompass with regard to DBA insurance is also without merit. As discussed, the Army initially believed that both offerors had failed to provide DBA insurance quotes. The Army resolved any confusion during discussions. See AR 741, 744, 763, 1069-70, 1087.

[27] Having failed to establish that the government's technical or price evaluations were "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law," Banknote, 365 F.3d at 1350, the court has no basis to grant the plaintiff's request for a permanent injunction. Centech Group, Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States,

## III.    CONCLUSION

For the forgoing reasons, the plaintiff's motion for judgment on the administrative record is **DENIED** and the government's and Encompass's cross-motions are **GRANTED**.  Each party shall bear its own costs.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (entitlement to permanent injunction requires success on the merits)).